**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS - AUSTIN DIVISION**

| | | |
|---|---|---|
| SHAUNA WINKELMAN, MICHAEL LENON, SCOTT CENNA, KALEA NIXON, ROBERT GOLDORAZENA, CHAD DIEHL and ROSS NANFELDT, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | **CIVIL ACTION NO.: 1:23-cv-1352** |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| WHOLE FOODS MARKET, INC., THE BOARD OF DIRECTORS OF WHOLE FOODS MARKET, INC., THE WHOLE FOODS MARKET, INC. EMPLOYER COMMITTEE, THE WHOLE FOODS MARKET, INC. 401(K) COMMITTEE, THE WHOLE FOODS MARKET, INC. BENEFITS ADMINISTRATIVE COMMITTEE and JOHN DOES 1-50. | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Shauna Winkelman, Michael Lenon, Scott Cenna, Kalea Nixon, Robert Goldorazena, Chad Diehl and Ross Nanfeldt ("Plaintiffs"), by and through their attorneys, on behalf of the Whole Foods Market Growing Your Future 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Plan's fiduciaries, which include Whole Foods Market, Inc. ("Whole Foods" or "Company") and the Board of Directors of Whole Foods Market, Inc. and its members during the Class Period[2] ("Board"), the Whole Foods Market, Inc. Employer Committee and its members during the Class Period ("Employer Committee"), the Whole Foods Market, Inc. 401(k) Committee and its members during the Class Period ("401(k) Committee")[3] and the Whole Foods Market, Inc. Benefits Administration Committee and its members during the Class Period ("Benefits Committee") for breaches of their fiduciary duties. When the Employer Committee, the 401(k) Committee and the Benefits Committee are referred to collectively they will be called the "Committees."

2.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and

---

[2] The Class Period, as will be discussed in more detail below, is defined as November 6, 2017 through the date of judgment.

[3] Prior to 2019, the Whole Foods Market, Inc. 401(k) Committee was known as the Whole Foods Market, Inc. Investment Committee ("Investment Committee"). Both the Investment Committee and the 401(k) Committee will be referred to as the "401(k) Committee."

service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.      Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

7.      At all times during the Class Period, the Plan had at least $1 billion dollars in assets under management.  At the end of fiscal year 2021 and 2020, the  Plan had over $1.9 billion dollars and $1.6 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2021 Report of Independent Auditor of the Whole Foods Market Growing Your Future 401(k) Plan ("2021 Auditor Report") at 5.

8.      The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan,

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

9.      The Plan is also large in terms of the number of its participants.  From 2017 to 2021, for example, the Plan had between 90,182 and 97,447 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances.

10.      Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees. Plans, such as the Plan, with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

11.      Not only does the number of participants add to the negotiating power of the Plan, but the Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2019, only 0.1 percent (776 of 603,217) of Plans in the country had more than $1 billion in assets under management.[5]  In addition, this was true at the start of the Class Period in 2017 where, again, only 0.1 percent (695 of 569,257) of 401(k) plans in the country were as large as the Plan.[6] As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 at Ex. 1.2, p. 13., available at
https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

participants' investments.  Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent.

12.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's administrative and recordkeeping ("RKA") costs.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

**Plaintiffs**

18.     Plaintiff, Shauna Winkelman ("Winkelman"), resides in Brown Deer, Wisconsin. During her employment, Plaintiff Winkelman participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Winkelman invested in the Fidelity Contrafund and the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above.  Ms. Winkelman suffered injury to her Plan account by overpaying for her share of RKA costs.

19.     Plaintiff, Michael Lenon ("Lenon"), resides in Las Vegas, Nevada. During his employment, Plaintiff Lenon participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Lenon invested in the Fidelity Contrafund, the Fidelity Total International Index fund, the Vanguard Institutional 500 Index fund and the Vanguard 2040 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above. Mr. Lenon suffered injury to his Plan account by overpaying for her share of RKA costs.

20.     Plaintiff, Scott Cenna ("Cenna"), resides in Horsham, Pennsylvania. During his employment, Plaintiff Cenna participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Cenna invested in the Fidelity Contrafund, the American Funds New Perspective fund, the Fidelity Total International Index fund, the Vanguard Explorer ADM fund, the DFA US Sustain Core fund, the Fidelity Capital and

Income fund, the MetWest Total Return fund and the Vanguard 2025 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above. Mr. Cenna suffered injury to his Plan account by overpaying for her share of RKA costs.

21.     Plaintiff, Kalea Nixon ("Nixon"), resides in Parkville, Maryland. During her employment, Plaintiff Nixon participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Nixon invested in the Vanguard 2060 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above.  Ms. Nixon suffered injury to her Plan account by overpaying for her share of RKA costs.

22.     Plaintiff, Robert Goldorazena ("Goldorazena"), resides in Scottsdale, Arizona. During his employment, Plaintiff Goldorazena participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Goldorazena invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Goldorazena suffered injury to his Plan account by overpaying for his share of RKA costs.

23.     Plaintiff, Chad Diehl ("Diehl"), resides in Philadelphia, Pennsylvania. During his employment, Plaintiff Diehl participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Diehl invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Diehl suffered injury to his Plan account by overpaying for his share of RKA costs.

24.     Plaintiff, Ross Nanfeldt ("Nanfeldt"), resides in Philadelphia, Pennsylvania. During his employment, Plaintiff Nanfeldt participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Nanfeldt invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Nanfeldt suffered injury to his Plan account by overpaying for his share of RKA costs.

25.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

26.     Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

27.     Whole Foods is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business being 550 Bowie Street, Austin, Texas. The December 31, 2021 Form 5500 of the Plan filed with the United States Department of Labor ("2021 Form 5500") at 1. Whole Foods is a nationwide grocery retailer which currently employs more than 90,000 people. Whole

Foods describes itself as "the world's leader in natural and organic foods, with 500+ stores in North America and the UK."[7]

28.     Whole Foods appointed the Committees to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan.[8] As will be discussed below, the Committees fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, Whole Foods during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

31.     Whole Foods, acting through its Board of Directors, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See* Foottnote 8, above.  As will be discussed below, the

---

[7] https://www.wholefoodsmarket.com/company-info last accessed on October 9, 2023.

[8] The roles of the Committees varied during the Class Period. Prior to 2019, the Employer Committee had more oversight over the 401(k) Committee and the Benefits Committee. Here, the roles of each Committee can refer to any role of any of the Committees at any time during the Class Period. *See*, the Unanimous Written Consent of the Whole Foods Market, Inc. Employer Committee dated November 19, 2019 at 1 and 2.

Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

33.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Employer Committee Defendants**

34.     As discussed above, Whole Foods and the Board appointed the Employer Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See* Footnote 8, above. In addition, the Employer Committee may have, at certain points during the Class Period, supervised the 401(k) Committee and/or the Benefits Committee which had control over Plan assets and the Plan document. *See,* Footnote 8, above. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because

each exercised discretionary authority over management or disposition of the Plan assets and/or because each had a duty to monitor the actions of the 401(k) Committee and/or the Benefits Committee.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**401(k) Committee Defendants**

37.     As discussed above, Whole Foods and/or the Board and/or the Employer Committee appointed the 401(k) Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See,* Footnote 8, above. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

38.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets.

39.     The 401(k) Committee and unnamed members of the 401(k) Committee during the Class Period (referred to herein as John Does 21-30), are collectively referred to herein as the "401(k) Committee Defendants."

**Benefits Committee Defendants**

40.     As discussed above, Whole Foods and/or the Board and/or the Employer Committee appointed the Benefits Committee to, among other things, ensure that the investments

available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See,* Footnote 8, above. As will be discussed below, the Benefits Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries. In addition, the Benefits Committee may have, at certain points during the Class Period, supervised the 401(k) Committee which had control over Plan assets and the Plan document. *See*, the Investment Management Agreement dated January 1, 2017 between Strategic Advisors and Whole Foods at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

41. The Benefits Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets and/or because each had a duty to monitor the actions of the 401(k) Committee.

42. The Benefits Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 31-40), are collectively referred to herein as the "Benefits Committee Defendants."

**Additional John Doe Defendants**

43. To the extent that there are additional officers, employees and/or contractors of Whole Foods who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants

41-50 include, but are not limited to, Whole Foods officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS[9]

44.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 6, 2017 through the date of judgment (the "Class Period").

45.    The members of the Class are so numerous that joinder of all members is impractical.  The 2021 401(k) Form 5500 lists 97,447 Plan "participants with account balances as of the end of the plan year."  2021 401(k) Form 5500 at 2.

46.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

47.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;
>
> C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of monetary relief.

48.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

49.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

51.     The Plan is a "defined contribution plan established January 1, 2002 by Whole Foods Market, Inc. (the 'Company' or 'Plan Sponsor') … " within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The 2021 Auditor Report at 7.

52.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2021 Auditor Report at 8. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

53.     In general, regular full-time employees are eligible to participate in the Plan from their first day of service. The 2021 Auditor Report at 7.

*Contributions*

54.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. The 2021 Auditor Report at 7.

55.     With regard to employee contributions in the Plan: "[p]articipants may contribute up to 100% of their annual compensation, as defined in the Plan, up to the maximum allowed under the Internal Revenue Code ("IRC")." 2021 Auditor Report at 7. Whole Foods will make matching contributions to the Plan on behalf of its employees as determined by the 401(k) Committee each year. For 2020 and 2021, Whole Foods "made a matching contribution on behalf of eligible participants equal to 14% of the first $1,000 of each such participant's contributions …" 2021 Auditor Report at 7.

56.     Like other companies that sponsor 401(k) plans for their employees, Whole Foods enjoys both direct and indirect benefits by providing matching contributions to the Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

57.     Whole Foods also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

58.     Given the size of the Plan, Whole Foods likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

59.     Participants are immediately vested in all contributions whether they were made by the employee or whether the contribution was a matching contribution made by Whole Foods.

*The Plan's Investments*

60.     The Plan's assets under management for all funds as of December 31, 2021 was $1,949,516,000. 2021 Auditor Report at 6.

*Payment of Plan Expenses*

61.     During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets. 2021 Auditor Report at 9.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.     The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

62.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

63.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

64.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

**ERISA's Fee Disclosure Rule**

65.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [12]

66.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

67.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

68.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

---

[12] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf*   ("DOL   408(b)(2) Regulation Fact Sheet")

69.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

70.     Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g*., plan administration, including recordkeeping, legal, accounting services)."  29 CFR § 2550.404a-5(C)(2)(ii)(B).

### B. Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants

71.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

72.     Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

73.     There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

>    A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.   Multi-channel participant and plan sponsor access (e.g. phone, web);

C.   Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.   Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.   Participant tax reporting services (e.g., IRS Form 1099-R);

F.   Participant confirmations, statements, and standard notices;

G.   Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.   Participant education (e.g. newsletters, web articles, standard communication materials);

I.   Plan consulting (e.g., preapproved document services, operational materials);

J.   Plan consulting (e.g. preapproved document services, operational compliance support).

74.     These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

75.     The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Recordkeepers for large 401(k) plans such as Vanguard and Fidelity invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

76.     The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions

and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping for a participant's account with a balance of $500,000, is the same as for a participant whose account balance is $5,000 in the same plan.

77.     The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

78.     When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See*, 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")[13]  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[14]

79.     Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

---

[13] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[14] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

80.     Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

81.     Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns.  There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

82.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

**C. Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Defendants**

83.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

84.     Other information has also not been made available to Plaintiffs.  For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees

being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

85.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[15]

86.     Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiffs here who do not have direct access to such information.

87.     Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making

---

[15] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

88.     In an attempt to discover the details of the Plan's mismanagement, on February 13, 2023, the Plaintiffs wrote to Whole Foods requesting, *inter alia*, meeting minutes from the Committee. By letter dated, March 24, 2023, Whole Foods provided very limited meeting minutes from February 2019 evidencing only a change in the responsibilities of the 401(k) Committee. All other information for these minutes was redacted by the Defendants.

89.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that's not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

90.     In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

91.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

92.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

### D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees

#### 1. The Plan's Recordkeeping Services Agreement with Fidelity Offered Routine Services

93.     Effective January 1, 2017, Whole Foods entered into a Trust Agreement with Fidelity Management Trust Company ("Fidelity") to, among other things, provide recordkeeping for the Plan.  *See* Trust Agreement Between Whole Foods Market, Inc. and Fidelity Management Trust Company for the Whole Foods Market Growing Your Future 401(k) Plan Trust, Restated and Dated as of January 1, 2017 ("2017 Trust Agreement").

94.     Per the 2017 Trust Agreement, Fidelity agreed to perform recordkeeping and administrative services in line with the routine services described in Section VI.B. above.  It agreed to perform "Administration" which included establishment and maintenance of participant accounts and election percentages, maintenance of Plan investment options, and maintenance of contribution sources.  2017 Trust Agreement at Schedule A.

95.     Additionally, Fidelity agreed to provide participant services, plan accounting, participant reporting, plan reporting, government reporting (*e.g* Form 5500s), and communication and education services.  *Id.*

96.     The 2017 Trust Agreement did not identify any unique services Fidelity would have to provide to the Plan that would make the recordkeeping services provided to the Plan differ in any material way from recordkeeping services provided by Fidelity or other nationally recognized recordkeepers to other jumbo plans like the Plan.

## 2. There is No Indication Defendants Conducted RFPs at Reasonable Intervals

97.     As noted above, 408(b)(2) disclosures are not available to plan participants.  By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

98.     Here it appears the Defendants failed to conduct a formal RFP in the years leading up to the start of the putative Class Period.  The fact that the Plan had the same recordkeeper in place, namely Fidelity, since 2011 with little meaningful change in the already excessive RKA rate strongly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

99.     Fidelity served as the Plan's recordkeeper throughout the Class Period.  In 2020, Fidelity, was one of the top recordkeepers nationally as measured by assets being recordkept as demonstrated in the chart, below:

**2020 TOP PROVIDERS (RECORDKEEPERS)[16]**

| Top 10, by Total 401(k) Assets ($MM) | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

100.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above recordkeepers who were peers of Fidelity and capable of providing lower recordkeeping fees as will be shown below.

101.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

102.    From information obtained through the Plaintiffs' request for Plan documents, the Plaintiffs were supplied with a historical snapshot of the RKA rates for the Plan. Starting in 2016, Fidelity charged a per participant RKA rate of $34. As discussed below, this rate was nearly double the reasonable RKA costs for a plan the size of this Plan during the same time period. There was a modest change in price in 2018 to $33 per participant and to $31 per participant as of 2020. However, "a high fee may reflect imprudence even if the fee falls year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-cv-01493, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021). These rates continued to exceed, by far, the reasonable rate for a plan the size of the Plan.  Again, had

---

[16] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

the Defendants sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been changed at some point or Fidelity would have agreed to its own admitted rate of $14-$21 per participant or less (discussed below) throughout the Class Period.

### 3. The Fidelity Stipulation

103.    In a recent lawsuit where Fidelity's multi-billion dollar plan with  at least 58,000 participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."  *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

104.    Specifically, Fidelity stipulated as follows:

> "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***"

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

105.    The signifiance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics.  The Plan had almost double the number of participants that the Fidelity plan had (meaning the Plan should have commanded lower fees) and was also a billion dollar plan like the Fidelity plan.

106.     Additionally, the operative recordkeeping agreement in this case went into effect on January 1, 2017, at which time the Fidelity stipulation stated the value of the type of services being received by the Plan was $14 per participant per year.  Given the trend of diminishing recordkeeping fees over the last few years (and as borne out by the diminishing fees described in the Fidelity stipulation), the value of the recordkeeping services provided to the Plan by Fidelity would likely be less than $14 per participant from 2020 to the present.

      **4. Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources that show the Plan's Recordkeeping Fees were/are Unreasonable**

107.     During the Class Period, the Plan's per participant total RKA fees were as follows:

| Year | Participants | Fidelity Per Participant Charge | Total Direct Costs |
|:---:|:---:|:---:|:---:|
| **2017** | 90,182 | $34 | $3,066,188 |
| **2018** | 92,635 | $33 | $3,056,955 |
| **2019** | 96,669 | $33 | $3,190,077 |
| **2020** | 97,506 | $31 | $3,022,686 |
| **2021** | 97,447 | $31 | $3,020,857 |

108.     At all times during the Class Period, the above fees were unreasonable. The above fees were unreasonable when benchmarked against similar plans and against Fidelity's own admitted range of reasonable rates for plans of this size.  As a point of emphasis,  in 2020, there were only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances (*see supra* ¶ 11) meaning the Plan fiduciaries had tremendous bargaining power.

109.     For purposes of this Complaint, Plaintiffs compare only the Plan's direct costs with the costs paid by other plans to illustrate the excessive nature of the RKA fees which were more than double a reasonable rate, even just looking at the direct costs.

110.    The Plan should have been able to obtain per participant recordkeeping fees of at least $14 especially from Fidelity.  This figure is determined by looking at the following factors: for each of the comparison plans, versus the Whole Foods Plan, the features of the plans are considered, (e.g. vesting, eligibility, distributions), number of plan participants, the number and nature of the investment options, the record keeping and administrative services available and utilized for plans of the size of the comparator and the Plan, the participant services available and utilized for plans of the size of the comparator and the Plan, and the reputation of the record keepers." *Id.* at ¶ 47.

111.    For purposes of negotiating a reasonable recordkeeping fee with a record keeper, a plan sponsor or fiduciary should ask the recordkeeper to combine and consider the total number of plan participants with account balances in all the plans sponsored by a company, something it appears the Plan's fiduciaries didn't do here given the excessive fees paid by both the Plan. Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few plans having more than 30,000 participants and more than $3 billion dollars in assets under management:

///

///

///

///

///

///

///

///

| Comparable Plans' R&A Fees Paid in 2021[17] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs | R&A Costs on Per-Participant Basis[18] | Record-keeper |
| Lowe's 401(k) Plan | 158,184 | $9,462,731,858 | $1,465,466 | $10 | Prudential and Wells Fargo |
| Kaiser Permanente 401k Retirement Plan | 149,636 | $18,614,838,105 | $1,805,723 | $12 | Vanguard |
| Apple 401(k) Plan | 131,476 | $16,718,024,180 | $1,801,830 | $14 | Great-West |
| Google 401(k) Plan | 124,725 | $30,556,649,022 | $2,054,930 | $17 | Vanguard |
| Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 51,325 | $7,716,754,000 | $687,000 | $14 | T. Rowe Price |
| Deseret 401(k) Plan | 36,079 | $5,437,144,766 | $773,365 | $22 | Great-West |
| Publicis Benefits Connection 401K Plan | 48,148 | $4,316,917,479 | $1,303,091 | $27 | Fidelity |

112.    The above comparisons confirm that the Plan's participant size could easily have

qualified it for RKA fees of no more than $10-$17 from several nationally recognized

---

[17] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2021, which is the most recent year for which many plans' Form 5500s are currently available. In addition, the amount calculated from the 5500 filing is likely high as it may include amounts placed in a revenue credit account or similar account which is then used to pay other administrative expenses. The Whole Foods Plan has any amounts placed in a revenue credit account backed out from reported direct revenue and deals only with the actual recordkeeping charge.

[18] R&A costs in this chart are derived from Schedule C of the Form 5500s and reflect fees paid to each plans' recordkeeper. However, as noted in the footnote above, these fees may be higher than the true cost of recordkeeping alone. The cost for recordkeeping alone is available for Whole Foods because additional data was available due to the fact that the Plaintiffs were Plan participants.

recordkeepers including Fidelity itself. This is evident from the Fidelity stipulation mentioned above and the fact that even a plan which was half the size of the Plan (Publicis Benefits Connection 401(k) Plan) was able to obtain a recordkeeping fee from Fidelity below that achieved by the Plan.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

113.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

114.   At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

115.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

116.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  The Prudence Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

117.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.  Had Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

118.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

119.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Whole Foods and the Board Defendants)**

120.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

121.    Whole Foods and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

122.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

123.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's

fiduciaries deemed to have breached their fiduciary duties;

     I.        An award of pre-judgment interest;

     J.        An award of costs pursuant to 29 U.S.C. § 1132(g);

     K.        An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

     L.        Such other and further relief as the Court deems equitable and just.


Dated: November 6, 2023          **THE LAW OFFICE OF KELL A. SIMON**

          */s/ Kell A. Simon*        .
          Kell A. Simon
          Texas Attorney ID # 24060888
          501 N. Interstate Highway 35, Suite 11
          Austin, Texas 78702
          Email: kell@kellsimonlaw.com
          Telephone: (512) 898-9019
          Fax: (512) 368-9144

          **CAPOZZI ADLER, P.C.**

          */s/ Donald R. Reavey*
          Donald R. Reavey, Esquire
          PA Attorney ID #82498
          (*Pro Hac Admission to be Requested*)
          2933 North Front Street
          Harrisburg, PA 17110
          Email: donr@capozziadler.com
          Telephone: (717) 233-4101
          Fax: (717) 233-4103

          */s/ Mark K. Gyandoh*
          Mark K. Gyandoh, Esquire
          PA Attorney ID # 88587
          (*Pro Hac Admission to be Requested*)
          **CAPOZZI ADLER, P.C.**
          312 Old Lancaster Road
          Merion Station, PA 19066

Email: markg@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*