**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
<u>AUSTIN DIVISION</u>**

| | | |
|---|---|---|
| SHAUNA WINKELMAN, MICHAEL LENON, SCOTT CENNA, KALEA NIXON, ROBERT GOLDORAZENA, CHAD DIEHL and ROSS NANFELDT, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | **CIVIL ACTION NO.: 1:23-cv-1352-RP** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| WHOLE FOODS MARKET, INC., THE BOARD OF DIRECTORS OF WHOLE FOODS MARKET, INC., THE WHOLE FOODS MARKET, INC. EMPLOYER COMMITTEE, THE WHOLE FOODS MARKET, INC. 401(K) COMMITTEE, THE WHOLE FOODS MARKET, INC. BENEFITS ADMINISTRATIVE COMMITTEE and JOHN DOES 1-50. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiffs, Shauna Winkelman, Michael Lenon, Scott Cenna, Kalea Nixon, Robert Goldorazena, Chad Diehl and Ross Nanfeldt ("Plaintiffs"), by and through their attorneys, on behalf of the Whole Foods Market Growing Your Future 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

---

[1]  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Whole Foods Market, Inc. ("Whole Foods" or "Company") and the Board of Directors of Whole Foods Market, Inc. and its members during the Class Period[2] ("Board"), the Whole Foods Market, Inc. Employer Committee and its members during the Class Period ("Employer Committee"), the Whole Foods Market, Inc. 401(k) Committee and its members during the Class Period ("401(k) Committee")[3] and the Whole Foods Market, Inc. Benefits Administration Committee and its members during the Class Period ("Benefits Committee") for breaches of their fiduciary duties. When the Employer Committee, the 401(k) Committee and the Benefits Committee are referred to collectively they will be called the "Committees."

2.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

---

[2] The Class Period, as will be discussed in more detail below, is defined as November 6, 2017 through the date of judgment.

[3] Prior to 2019, the Whole Foods Market, Inc. 401(k) Committee was known as the Whole Foods Market, Inc. Investment Committee ("Investment Committee"). Defendants also state the 401(k) Committee is now known as the WFM Retirement Committee. *See* ECF No. 15, at 1.  For purposes of this complaint, the "401(k) Committee" means the Investment Committee, the 401(k) Committee and the WFM Retirement Committee.

3.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."  *See, "A Look at 401(k) Plan Fees," supra*, at n.3.

4.      With regard to plan fees, the DOL states "You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan." U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020).

5.      At all times during the Class Period, the Plan had at least $1 billion dollars in assets under management.  At the end of fiscal year 2021 and 2020, the  Plan had over $1.9 billion dollars and $1.6 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2021 Report of Independent Auditor of the Whole Foods Market Growing Your Future 401(k) Plan ("2021 Auditor Report") at 5.

6.      The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

7.      The Plan is also large in terms of the number of its participants.  From 2017 to 2022, for example, the Plan had between 90,182 and 111,989 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the DOL by retirement plans, in 2020, there were only 125

defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances.

8.      Digging deeper, as of the end of 2022, there were only 47 (forty-seven) 401(k) retirement plans with 90,000 or more participants and 41 (forty-one) 401(k) plans with 100,000 or more participants.

9.      Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees. Plans, such as the Plan, with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

10.      Not only does the number of participants add to the negotiating power of the Plan, but the Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2019, only 0.1 percent (776 of 603,217) of Plans in the country had more than $1 billion in assets under management.[4]  In addition, this was true at the start of the Class Period in 2017 where, again, only 0.1 percent (695 of 569,257) of 401(k) plans in the country were as large as the Plan.[5] As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent.

11.      Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached

---

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 at Ex. 1.2, p. 13., available at
https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's administrative and recordkeeping ("RKA") costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

**Plaintiffs**

17.     Plaintiff, Shauna Winkelman ("Winkelman"), resides in Brown Deer, Wisconsin. During her employment, Plaintiff Winkelman participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Winkelman invested in the Fidelity Contrafund and the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above.  Ms. Winkelman suffered injury to her Plan account by overpaying for her share of RKA costs.

18.     Plaintiff, Michael Lenon ("Lenon"), resides in Las Vegas, Nevada. During his employment, Plaintiff Lenon participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Lenon invested in the Fidelity Contrafund, the Fidelity Total International Index fund, the Vanguard Institutional 500 Index fund and the Vanguard 2040 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above. Mr. Lenon suffered injury to his Plan account by overpaying for his share of RKA costs.

19.     Plaintiff, Scott Cenna ("Cenna"), resides in Horsham, Pennsylvania. During his employment, Plaintiff Cenna participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Cenna invested in the Fidelity Contrafund, the American Funds New Perspective fund, the Fidelity Total International Index fund, the Vanguard Explorer ADM fund, the DFA US Sustain Core fund, the Fidelity Capital and Income fund, the MetWest Total Return fund and the Vanguard 2025 target date fund in the Plan. A portion of the quarterly returns from these funds were used to pay for the excessive recordkeeping fees, discussed above. Mr. Cenna suffered injury to his Plan account by overpaying for his share of RKA costs.

20.    Plaintiff, Kalea Nixon ("Nixon"), resides in Parkville, Maryland. During her employment, Plaintiff Nixon participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Nixon invested in the Vanguard 2060 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above.  Ms. Nixon suffered injury to her Plan account by overpaying for her share of RKA costs.

21.    Plaintiff, Robert Goldorazena ("Goldorazena"), resides in Scottsdale, Arizona. During his employment, Plaintiff Goldorazena participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Goldorazena invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Goldorazena suffered injury to his Plan account by overpaying for his share of RKA costs.

22.    Plaintiff, Chad Diehl ("Diehl"), resides in Philadelphia, Pennsylvania. During his employment, Plaintiff Diehl participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Diehl invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Diehl suffered injury to his Plan account by overpaying for his share of RKA costs.

23.    Plaintiff, Ross Nanfeldt ("Nanfeldt"), resides in Philadelphia, Pennsylvania. During his employment, Plaintiff Nanfeldt participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Nanfeldt invested in the Vanguard 2050 target date fund in the Plan. A portion of the quarterly returns from

this fund was used to pay for the excessive recordkeeping fees, discussed above. Mr. Nanfeldt suffered injury to his Plan account by overpaying for his share of RKA costs.

24.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25.     Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

26.     Whole Foods is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 550 Bowie Street, Austin, Texas. The December 31, 2021 Form 5500 of the Plan filed with the United States Department of Labor ("2021 Form 5500") at 1. Whole Foods is a nationwide grocery retailer which currently employs more than 90,000 people. Whole Foods describes itself as "the world's leader in natural and organic foods, with 500+ stores in North America and the UK."[6]

27.     Whole Foods appointed the Committees to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for

---

[6] https://www.wholefoodsmarket.com/company-info last accessed on October 9, 2023.

recordkeeping given the size of the Plan.[7] As will be discussed below, the Committees fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.    Accordingly, Whole Foods during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

29.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

30.    Whole Foods, acting through its Board of Directors, among other things, ensures that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See* Footnote 8, above.  As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

---

[7] The roles of the Committees varied during the Class Period. Prior to 2019, the Employer Committee had more oversight over the 401(k) Committee and the Benefits Committee. Here, the roles of each Committee can refer to any role of any of the Committees at any time during the Class Period. *See*, the Unanimous Written Consent of the Whole Foods Market, Inc. Employer Committee dated November 19, 2019 at 1 and 2.

32.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Employer Committee Defendants**

33.     As discussed above, Whole Foods and the Board appointed the Employer Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See* Footnote 8, above. In addition, the Employer Committee may have, at certain points during the Class Period, supervised the 401(k) Committee and/or the Benefits Committee which had control over Plan assets and the Plan document. *See,* Footnote 8, above. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

34.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets and/or because each had a duty to monitor the actions of the 401(k) Committee and/or the Benefits Committee.

35.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**401(k) Committee Defendants**

36.     As discussed above, Whole Foods and/or the Board and/or the Employer Committee appointed the 401(k) Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See,* Footnote 8, above. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

37.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets.

38.     The 401(k) Committee and unnamed members of the 401(k) Committee during the Class Period (referred to herein as John Does 21-30), are collectively referred to herein as the "401(k) Committee Defendants."

**Benefits Committee Defendants**

39.     As discussed above, Whole Foods and/or the Board and/or the Employer Committee appointed the Benefits Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan. *See,* Footnote 8, above. As will be discussed below, the Benefits Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries. In addition, the Benefits Committee may have, at certain points during the Class Period, supervised

the 401(k) Committee which had control over Plan assets and the Plan document. *See*, the Investment Management Agreement dated January 1, 2017 between Strategic Advisors and Whole Foods at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

40.    The Benefits Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets and/or because each had a duty to monitor the actions of the 401(k) Committee.

41.    The Benefits Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 31-40), are collectively referred to herein as the "Benefits Committee Defendants."

**Additional John Doe Defendants**

42.    To the extent that there are additional officers, employees and/or contractors of Whole Foods who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 41-50 include, but are not limited to, Whole Foods officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.  CLASS ACTION ALLEGATIONS[8]

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required

43.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 6, 2017 through the date of judgment (the "Class Period").

44.     The members of the Class are so numerous that joinder of all members is impractical.  The 2021 401(k) Form 5500 lists 97,447 Plan "participants with account balances as of the end of the plan year."  2021 401(k) Form 5500 at 2.

45.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;

---

for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

  B.  Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

  C.  Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

  D.  The proper form of equitable and injunctive relief; and

  E.  The proper measure of monetary relief.

47. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

48. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

50.    The Plan is a "defined contribution plan established January 1, 2002 by Whole Foods Market, Inc. (the 'Company' or 'Plan Sponsor') … " within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The 2021 Auditor Report at 7.

51.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2021 Auditor Report at 8. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

52.    In general, regular full-time employees are eligible to participate in the Plan from their first day of service. The 2021 Auditor Report at 7.

### *Contributions*

53.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. The 2021 Auditor Report at 7.

54.    With regard to employee contributions in the Plan: "[p]articipants may contribute up to 100% of their annual compensation, as defined in the Plan, up to the maximum allowed under the Internal Revenue Code ("IRC")." 2021 Auditor Report at 7. Whole Foods will make matching contributions to the Plan on behalf of its employees as determined by the 401(k) Committee each year. For 2020 and 2021, Whole Foods "made a matching contribution on behalf of eligible participants equal to 14% of the first $1,000 of each such participant's contributions ..." 2021 Auditor Report at 7.

55.    Like other companies that sponsor 401(k) plans for their employees, Whole Foods enjoys both direct and indirect benefits by providing matching contributions to the Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

56.    Whole Foods also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

57.    Given the size of the Plan, Whole Foods likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

58.    Participants are immediately vested in all contributions whether they were made by the employee or whether the contribution was a matching contribution made by Whole Foods.

***The Plan's Investments***

59.    The Plan's assets under management for all funds as of December 31, 2021 was $1,949,516,000. 2021 Auditor Report at 6.

**Payment of Plan Expenses**

60.    During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets. 2021 Auditor Report at 9.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.    The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

61.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

62.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

63.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

**ERISA's Fee Disclosure Rule**

64.    In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [11]

65.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

66.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

67.    The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

68.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

69.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among

---

[11] *See* *https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g*., plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

### B. Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants

70.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

71.    Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

72.    There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

    A.  Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

    B.  Multi-channel participant and plan sponsor access (e.g. phone, web);

    C.  Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

    D.  Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

    E.  Participant tax reporting services (e.g., IRS Form 1099-R);

F.   Participant confirmations, statements, and standard notices;

G.   Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.   Participant education (e.g. newsletters, web articles, standard communication materials);

I.   Plan consulting (e.g., preapproved document services, operational materials);

J.   Plan consulting (e.g. preapproved document services, operational compliance support).

73.   These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

74.   The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

75.   The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a

result, the cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balances is $5,000 in the same plan.

76.    The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

77.    When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See*, 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.") [12] ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[13]

78.    Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

79.    Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  Accordingly, a plan sponsor or fiduciary has the leverage

---

[12] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[13] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

to negotiate favorable rates given that costs of implementation do not change for the service provider.

80.     Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns.  There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

81.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

**C.  Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Defendants**

82.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

83.     Other information has also not been made available to Plaintiffs.  For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, a RFP should happen at least every three

to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

84.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[14]

85.     Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiffs here who do not have direct access to such information.

86.     Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

87.     In an attempt to discover the details of the Plan's mismanagement, on February 13, 2023, the Plaintiffs wrote to Whole Foods requesting, *inter alia*, meeting minutes from the

---

[14] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

Committee. By letter dated, March 24, 2023, Whole Foods provided very limited meeting minutes from February 2019 evidencing only a change in the responsibilities of the 401(k) Committee. All other information for these minutes was redacted by the Defendants.

88.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that's not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

89.     In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

90.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

91.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

**D.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

**1.    The Plan's Recordkeeping Services Agreement with Fidelity Offered Routine Services**

92.    Effective January 1, 2017, Whole Foods entered into a Trust Agreement with Fidelity Management Trust Company ("Fidelity") to, among other things, provide recordkeeping for the Plan.  *See* Trust Agreement Between Whole Foods Market, Inc. and Fidelity Management Trust Company for the Whole Foods Market Growing Your Future 401(k) Plan Trust, Restated and Dated as of January 1, 2017 ("2017 Trust Agreement"), WFM_0133-WFM_0231.

93.    During the Class Period, Fidelity was one of the top recordkeepers nationally as measured by assets being recordkept.  For example, in 2020 Fidelity ranked as follows:

**2020 TOP PROVIDERS (RECORDKEEPERS)[15]**

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

---

[15] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

94.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

95.    Per the 2017 Trust Agreement, Fidelity agreed to perform recordkeeping and administrative services in line with the routine services described in Section VI.B. above and which any of the top ten recordkeepers are capable of performing.  Fidelity agreed to perform "Administration" which included establishment and maintenance of participant accounts and election percentages, maintenance of Plan investment options, and maintenance of contribution sources.  2017 Trust Agreement at Schedule A.

96.    Additionally, Fidelity agreed to provide participant services, plan accounting, participant reporting, plan reporting, government reporting (*e.g* Form 5500s), and communication and education services.  *Id.* at WFM_0169 – WFM_0173.  These services are routine.  This is illustrated by the attached sample Fidelity services agreement that forms the basis of all service agreements with Fidelity clients. *See* Exhibit A.   Under Schedule B of the sample agreement, Fidelity offers the same range of services as it does for the Plan (p10).  Any services falling outside core services are billed separately (p.28).

97.    Schedule B of the 2017 Trust Agreement, the Fee Schedule, indicates all "Ongoing Communication and Education" services (such as multi-touch enrollment, onboarding program, needs-based workplace campaigns, needs based life stage messaging campaigns, education campaigns for retirees and job changers with postage included) are included in the per participant costs.  *Id.* at WFM_0174. The recordkeeping fee also includes 20 days onsite up to 4 meetings/day, and $1,800 per additional day. *Id.*  at WFM_0175.

98.     The 2017 Trust Agreement did not identify any unique services Fidelity would have to provide to the Plan that would make the recordkeeping services provided to the Plan differ in any material way from recordkeeping services provided by Fidelity or other nationally recognized recordkeepers to other jumbo plans like the Plan.

99.     Indeed, any additional services outside the core services provided by Fidelity required additional fees to be paid.  For example, "Special Projects" incur an additional fee of $175/hr. WFM_0176.  And as another example, effective January 1, 2019 when the per participant fee was $33 per participant, the recordkeeping services agreement stated "Live Plan Specific Web Workshop Sessions" cost $200 per session.  *See* First Amendment to Trust Agreement Between Fidelity Management Trust Co. and Whole Foods Market, Inc. at 9, WFM_0245. Additionally, if Fidelity needed to perform services to locate lost participants it would cost an additional $22 to $38 per participant, depending on the tier level selected, to perform the service.  *Id.* at p. 45, WFM_0281.

### 2.     There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period

100.    As noted above, 408(b)(2) disclosures are not available to plan participants.  By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

101.    Here it appears the Defendants failed to conduct a RFP in the years leading  up to the start of the putative Class Period.  The fact that the Plan had the same recordkeeper in place, namely Fidelity, since 2011 with little meaningful change in the already excessive RKA rate strongly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants

when they failed to genuinely attempt to seek a competitive market rate for RKA fees. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

102.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Fidelity and capable of providing lower recordkeeping fees.   Had Defendants sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been changed at some point or Fidelity would have agreed to pay its own admitted reasonable rate of $14-$21 per participant or less (discussed below) throughout the Class Period.

103.    Apart from failing to reduce the Plan's recordkeeping fees through a RFP, the evidence also indicates the Plan's fiduciaries failed to leverage the Plan's massive size to negotiate lower recordkeeping fees.

104.     From information obtained through the Plaintiffs' request for Plan documents, the Plaintiffs were supplied with a historical snapshot of the RKA rates for the Plan. Starting in 2016, Fidelity charged a per participant RKA rate of $34. As discussed below, this rate was nearly double the reasonable RKA costs for a plan the size of this Plan during the same time period. There was a modest change in price in 2018 to $33 per participant and to $31 per participant since 2020. However, "a high fee may reflect imprudence even if the fee falls year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc*., No. 2:20-cv-01493, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021).

105.    These rates continued to exceed, by far, the reasonable rate for a plan the size of the Plan. But importantly, even as the number of Plan participants increased and the Plan's services stayed the same, there was no decrease in the Plan's recordkeeping fees.

106.    In particular, the Plan's recordkeeping fee has stayed at $31 per participant since 2020 even though the Plan's participants have increased by nearly 14,000 participants during that time period and the Plan's recordkeeping services have not changed:

| Year | Participants (PP) | Fidelity Per Participant Charge (PPC) | Total Direct Costs (PP x PPC) |
|------|------|------|------|
| **2020** | 97,506 | $31 | $3,022,686 |
| **2021** | 97,447 | $31 | $3,020,857 |
| **2022** | 111,989 | $31 | $3,471,659 |

107.    There is no reasonable justification for the Plan to pay nearly a half-million dollars per year more for recordkeeping for the *same* services.  The Plan's Second Quarter 2022 Investment Management Review, WFM_0335 – WFM_0493 notes the increase in Plan participants as of Q3 of 2022 and makes no mention of any additional recordkeeping services being provided by Fidelity.

### 3.    The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recording Fees Should Decline as Plan Size Increases

108.    During the Class Period, the Plan's per participant total RKA fees were as follows:

| Year | Participants (PP) | Fidelity Per Participant Charge (PPC) | Total Direct Costs (PP x PPC) |
|------|------|------|------|
| **2017** | 90,182 | $34 | $3,066,188 |
| **2018** | 92,635 | $33 | $3,056,955 |
| **2019** | 96,669 | $33 | $3,190,077 |
| **2020** | 97,506 | $31 | $3,022,686 |
| **2021** | 97,447 | $31 | $3,020,857 |
| **2022** | 111,989 | $31 | $3,471,659 |

109.    At all times during the Class Period, the above fees were unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect

minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."
Accordingly, the larger the plan, the lower the recordkeeping fee should be.

110.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches.  For example, the leading publication that collects 401(k) data is BrightScope/ICI.  *See* fn. 4.  It categorizes plans in the following tranches:



EXHIBIT I.2
**Universe of 401(k) Plans**
Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2019

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Less than $1M | 336,744 | 55.8% | 5,675.6 | 7.7% | $104.7 | 1.7% |
| $1M to $10M | 225,598 | 37.4 | 13,607.0 | 18.5 | 691.6 | 11.3 |
| >$10M to $50M | 31,260 | 5.2 | 10,248.3 | 14.0 | 631.3 | 10.3 |
| >$50M to $100M | 4,213 | 0.7 | 4,659.1 | 6.3 | 294.1 | 4.8 |
| >$100M to $250M | 2,724 | 0.5 | 6,937.8 | 9.5 | 423.0 | 6.9 |
| >$250M to $500M | 1,176 | 0.2 | 5,293.8 | 7.2 | 410.5 | 6.7 |
| >$500M to $1B | 726 | 0.1 | 5,415.6 | 7.4 | 512.3 | 8.3 |
| More than $1B | 776 | 0.1 | 21,557.2 | 29.4 | 3,068.2 | 50.0 |
| All plans | 603,217 | 100.0 | 73,394.3 | 100.0 | 6,135.6 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Fewer than 100 | 536,971 | 89.0% | 11,262.6 | 15.3% | $832.8 | 13.6% |
| 100 to 499 | 51,998 | 8.6 | 10,132.0 | 13.8 | 654.2 | 10.7 |
| 500 to 999 | 6,599 | 1.1 | 4,585.5 | 6.2 | 326.6 | 5.3 |
| 1,000 to 4,999 | 5,908 | 1.0 | 12,272.5 | 16.7 | 1,048.0 | 17.1 |
| 5,000 to 9,999 | 876 | 0.1 | 6,041.3 | 8.2 | 620.4 | 10.1 |
| 10,000 or more | 865 | 0.1 | 29,100.3 | 39.6 | 2,653.7 | 43.3 |
| All plans | 603,217 | 100.0 | 73,394.3 | 100.0 | 6,135.6 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf. Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own.

111.    Starting at 2022, the most recent year for which most plan Form 5500s are available, demonstrates the unreasonably high Plan fees when looking at the fees of the Plan's peers:

| Plan Name | Plan Year | Assets > $1 billion | Participants | Cost per participant[16] |
|---|---|---|---|---|
| Costco 401(k) Retirement Plan | 2022 | $25,412,076,000 | 231,411 | $17.00[17] |
| Lowes 401(k) Plan | 2022 | $7,376,782,360 | 149,935 | $8.80 |
| Google, LLC 401(k) Plan | 2022 | $28,898,202,210 | 148,787 | $14.44 |
| Citi Retirement Savings Plan | 2022 | $16,946,720,993 | 119,328 | $22.43 |
| Macy's Inc. 401(k) Retirement Investment Plan | 2022 | $3,583,497,000 | 130,388 | $18.20[18] |
| **Whole Foods Plan** | **2022** | **$1,674,000,000** | **111,989** | **$31** |

112.    The above chart demonstrates that for plans with more than a billion dollars and 100,000 participants, the Plan had one of the highest recordkeeping fees.  As noted above, as of the end of 2022 there were only 41 401(k) plans with 100,000 or more participants.  The Plan's $31 per participant fee is nearly twice the average fee of $16.17 per participant for the five plans listed above.  This vast discrepancy between the Plan's recordkeeping fees existed for all years of the Class Period.  The below chart illustrates the point:

---

[16] Unless otherwise noted, the participant recordkeeping fees are derived from the various plans' Form 5500 filings.

[17] *See* Costco 401(k) Retirement Plan SPD, Jan. 1, 2022 at 30 ("The Plan's recordkeeping expenses are charged to Plan accounts. The charge (currently, $4.25 per quarter) will be taken from your investments on a pro-rata basis ….). (Exhibit B).

[18] *See* Macy's Inc. 401(k) Retirement Investment Plan, Participant Disclosure of Plan and Investment Related Information, at 3 ("The Plan Sponsor and service provider have agreed upon $18.20 per participant annually to cover the cost of administrative services") (Exhibit C).

| Plan Name | Plan Year | Assets > $1b | Participants | Cost per participant[19] |
|---|---|---|---|---|
| Citi Retirement Savings Plan | 2022 | Yes | 119,328 | $22.43 |
| Costco 401(k) Retirement Plan | 2022 | Yes | 231,411 | $17.00 |
| Macy's Inc. 401(k) Retirement Investment Plan | 2022 | Yes | 130,388 | $18.20 |
| **Whole Foods Plan** | **2022** | **Yes** | **111,989** | **$31.00** |
| | | | | |
| Lowe's 401(k) Plan | 2021 | Yes | 158,184 | $10 |
| Kaiser Permanente 401k Retirement Plan | 2021 | Yes | 149,636 | $12 |
| Apple 401(k) Plan | 2021 | Yes | 131,476 | $14 |
| Google 401(k) Plan | 2021 | Yes | 124,725 | $17 |
| Publicis Benefits Connection 401K Plan | 2021 | Yes | 48,148 | $27 |
| **Whole Foods Plan** | **2021** | **Yes** | **97,447** | **$31** |
| | | | | |
| Apple 401(k) Plan | 2020 | Yes | 127,321 | $12.77 |
| **Whole Foods Plan** | **2020** | **Yes** | **97,506** | **$31.00** |
| | | | | |
| Publicis Benefits Connection 401K Plan | 2019 | Yes | 48,353 | $21 |
| Deseret 401(k) Plan | 2019 | Yes | 34,938 | $22 |
| The Savings and Investment Plan [WPP Group] | 2019 | Yes | 35,927 | $27 |
| The Dow Chemical Company Employees' Savings Plan | 2019 | Yes | 37,868 | $25 |
| **Whole Foods Plan** | **2019** | **Yes** | **96,669** | **$33** |
| | | | | |
| AT&T Retirement Savings Plan | 2018 | Yes | 249,894 | $15.45[20] |
| **Whole Foods Plan** | **2018** | **Yes** | **92,635** | **$33** |

113.    Dating back to 2018, the Plan's recordkeeping fees remained among the highest for billion dollar plans while consistently having some of the largest numbers of Plan participants, an aspect of the Plan that should have commanded much lower fees.   As a point of emphasis,  in

---

[19] Unless otherwise noted, the participant recordkeeping fees are derived from the various plans' Form 5500 filings. The plans depicted utilize little to no revenue sharing to pay for recordkeeping.  For example, the Apple plan all utilizes collective investment trusts (CITs) which do not use revenue sharing.  Accordingly, there should be minimal discrepancy between the reported recordkeeping fees on the Form 5500s and the actual 404(a) disclosures.  *See* Discussion *supra* at VI.A.

[20] *See* AT&T Retirement Savings Plan Disclosure at p.84 (showing administrative, trustee, and recordkeeping fees are .01% of assets) (Exhibit D)

2020, there were only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances (*see supra* ¶ 7) meaning the Plan fiduciaries had tremendous bargaining power.

> **4. The Plan's Recordkeeping Fees Are Unreasonable When Compared to the Lower Recordkeeping Fees for Similar Services Performed by Fidelity for Similarly Situated Plans and Plans with Less Bargaining Power than the Plan**

114.    The final factor indicating the Plan overpaid for recordkeeping fees during the Class Period is based on the fact that Fidelity charges, and has charged, lower recordkeeping fees to other plans, much smaller in size to the Plan in terms of the number of participants (and thus plans with less bargaining power than the Plan), for the same routine recordkeeping services it offered to the Plan.

115.    In a recent lawsuit where Fidelity's own multi-billion dollar plan with at least 58,000 participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

116.    Fidelity itself defines the relevant marketplace as plans with over a billion dollars in assets confirming the meaningfulness of the billion-dollar asset marker as used herein.

117.    Fidelity stipulated as follows: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14*

*per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period*** (**November 18, 2014 to the present**).

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

118.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics.  The Plan had almost double the number of participants that the Fidelity plan had (meaning the Plan should have commanded lower fees) and was also a billion- dollar plan like the Fidelity plan.

119.    Additionally, the operative recordkeeping agreement in this case went into effect on January 1, 2017 at which time the Fidelity stipulation stated the value of the type of services being received by the Plan was $14 per participant per year.  Given the trend of diminishing recordkeeping fees over the last few years (and as borne out by the diminishing fees described in the Fidelity stipulation and the other plans cited in this complaint), the value of the recordkeeping services provided to the Plan by Fidelity would likely be less than $14 per participant at present.

120.    Looking at several other retirement plans recordkept by Fidelity during the span of the Class Period further demonstrates that plans ranging from around half a billion dollars to over a billion dollars in assets under management, and having over 10,000 plan participants (the last tranche in the 2019 BrightScope ICI study), were able to obtain recordkeeping fees from Fidelity that were below the fees of the Plan even though the Plan had a greater bargaining advantage with

its immense size than all the other plans and should have been able to command much lower recordkeeping fees:

| Plans Recordkept by Fidelity | | | | | |
|---|---|---|---|---|---|
| Plan Name | Plan Year | Assets > $1b | Assets > $.4 b | Participants | Cost per participant[21] |
| Tesla, Inc. 401(k) Plan | 2021 | Yes | | 61,773 | $27 |
| Publicis Benefits Connection 401K Plan | 2021 | Yes | | 48,148 | $27 |
| **Whole Foods Plan** | **2021** | **Yes** | | **97,447** | **$31** |
| | | | | | |
| Chevron Employee Savings Investment Plan | 2020 | Yes | | 33,484 | $26 |
| **Whole Foods Plan** | **2020** | **Yes** | | **97,506** | **$31.00** |
| | | | | | |
| Publicis Benefits Connection 401K Plan | 2019 | Yes | | 48,353 | $21 |
| Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | | $843,224,007 | 10,072 | $22 |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | | $435,391,716 | 14,698 | $23 |
| Tesla, Inc. 401(k) Plan | 2019 | | $633,256,831 | 36,431 | $26 |
| The Dow Chemical Company Employees' Savings Plan | 2019 | Yes | | 37,868 | $25 |
| **Whole Foods Plan** | **2019** | **Yes** | | **96,669** | **$33** |
| | | | | | |
| AT&T Retirement Savings Plan | 2018 | Yes | | 249,894 | $15.45[22] |
| Danaher Corporation & Subsidiaries Savings Plan | 2018 | Yes | | 35,757 | $28.00 |
| Publicis Benefits Connection 401K Plan | 2018 | Yes | | 42,316 | $28.00 |
| **Whole Foods Plan** | **2018** | **Yes** | | **92,635** | **$33** |

121. The Plan should have been able to obtain per participant recordkeeping fees of at least $10-$17 ($17 being the number Fidelity stipulated to as reasonable) per participant from Fidelity based on its immense size and the routine nature of the recordkeeping services performed by Fidelity. As noted above, Fidelity largely offers the same services to its 401(k) clients. Any services beyond the routine are billed on top of the core charges. This fee range is consistent with

---

[21] Unless otherwise noted, these fees are taken from the Form 5500.
[22] *See* AT&T Retirement Savings Plan Disclosure at p.84 (showing administrative, trustee, and recordkeeping fees are .01% of assets) (Exhibit D)

the average recordkeeping fees paid by the largest plans in the country as demonstrated in the allegations above showing five of the 401(k) plans in the country with over 100,000 plan participants paid an average of $16.17 per participant in 2022.

## FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

122.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

123.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

124.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

125.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  The Prudence Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

126.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.  Had Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

127.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

128.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Whole Foods and the Board Defendants)**

129.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

130.    Whole Foods and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

131.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

132.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

133.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

134.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's

fiduciaries deemed to have breached their fiduciary duties;

     I.       An award of pre-judgment interest;

     J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

     K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

     L.      Such other and further relief as the Court deems equitable and just.

Dated: March 11, 2024       **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(Admitted *Pro Hac Vice*)
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax: (717) 233-4103

Donald R. Reavey, Esquire
PA Attorney ID #82498
(Admitted *Pro Hac Vice*)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax: (717) 233-4103

**THE LAW OFFICE OF KELL A. SIMON**
Kell A. Simon
Texas Attorney ID # 24060888
501 N. Interstate Highway 35, Suite 11
Austin, Texas 78702
kell@kellsimonlaw.com
(512) 898-9019
Fax: (512) 368-9144

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: <u>*/s/ Mark K. Gyandoh*</u>